# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS

----------------------------------------------------------------x

NESTOR ALFONSO,

Plaintiff,

- against -

KENTSHIRE GALLERIES, LTD.,

Defendant.

----------------------------------------------------------------x

Index No.:

**SUMMONS**

Plaintiff designates County of Queens as the place of trial

The basis for Venue is Plaintiff's residence, in Queens County

TO THE ABOVE-NAMED DEFENDANT:
KENTSHIRE GALLERIES, LTD.
c/o Matthew Imberman, as Registered Agent and/or CEO
608 5th Ave, Suite 800
New York, New York, 10020

YOU ARE HEREBY SUMMONED to answer the complaint of the plaintiff(s) herein and to serve a copy of your answer on the plaintiff(s) at the address indicated below within twenty (20) days after the service of this Summons (not counting the day of service itself), or within thirty (30) days after service is complete if the Summons is not delivered personally to you within the State of New York. YOU ARE HEREBY NOTIFIED THAT should you fail to answer, a judgment will be entered against you by default for the relief demanded in the complaint.

Dated: White Plains, New York
August 20, 2026

KRAVETS & ASSOCIATES, P.C.
*Attorneys for Plaintiff*

**/s/ Aleksandra Kravets**

**By:** Aleksandra Kravets, Esq.
75 South Broadway, Suite 4505
White Plains, New York 10601
Tel 347-268-9533
Email : ak@akesqpa.com

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS

NESTOR ALFONSO,

Plaintiff,

v.

KENTSHIRE GALLERIES, LTD.,

Defendant.

Index No.:

COMPLAINT

Plaintiff Demands a Jury Trial

Plaintiff NESTOR ALFONSO ("Plaintiff"), by and through his attorneys, files this complaint against defendant KENTSHIRE GALLERIES, LTD., ("Defendant"), and alleges as follows:

**INTRODUCTION**

1. This lawsuit challenges Defendant's discriminatory business practices. Specifically, Defendant's Website (as defined *infra*) contained access barriers that prevented Plaintiff, and other visually impaired and/or legally blind individuals like him, from purchasing products thereon.

2. For sighted, blind, and visually impaired individuals, the internet has become a significant source of information and entertainment, a tool for conducting business, and a means of accomplishing countless everyday activities such as shopping, banking, and learning. In today's tech-savvy, instantaneous world of online commerce, blind and visually impaired people must have the ability to access websites to enjoy the same convenience and savings allowed by online shopping as sighted New Yorkers. The primary means by which they do so is via screen reading software that vocalizes the visual information found on a computer screen.

3. Defendant is an online retail company, who owns and/or operates www.kentshire.com ("Website" or "Defendant's Website"). Through the Website, Defendant sells fine, antique, estate, engagement, bridal, and contemporary jewelry, such as rings, necklaces, bracelets, earrings, brooches, watches, and pendants.

4. Defendant and its Website—which is not equally accessible to blind and/or visually impaired consumers like Plaintiff—violate the following: (i) the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*; (ii) the New York State Civil Rights Law, § 40 *et seq.* ("NYSCRL") and § 40-c *et seq.*; and (iii) the New York City Human Rights Law, N.Y.C. Administrative Code §§ 8-101 *et seq.* ("NYCHRL"). In addition, Defendant's denial of full and equal access to its Website to Plaintiff and other blind and/or visually impaired consumers, and therefore denial of its products and services offered thereon and in conjunction with its physical locations, is a violation of the rights of Plaintiff and other blind and/or visually impaired consumers under the Americans with Disabilities Act, 42 U.S.C §§ 12101 *et seq.*, § 12182, and the implementing regulations set forth at 28 CFR §§ 36.101 *et seq*. (collectively, the "ADA").

5. Plaintiff brings this action in his individual capacity as someone who sought to purchase the goods and products that Defendant sells and/or otherwise benefit from the products and services offered on Defendant's Website.

6. Plaintiff seeks, *inter alia*, a preliminary and permanent injunction, other declaratory relief, statutory damages, actual and punitive damages, pre-judgment and post-judgment interest, and reasonable attorneys' fees and expenses.

**ADMINISTRATIVE PROCEDURES**

7. Plaintiff did not contact Defendants prior to the commencement of this action, as such notice would be futile.

8. Pre-suit notice to Defendants is also not required to bring a claim based on disparate impact, or based on the Americans with Disabilities Act.

## JURISDICTION AND VENUE

9. Jurisdiction in this action is based on N.Y. C.P.L.R. § 302, as Defendant transacts business within the state, or contracts anywhere to supply goods or services in the state.

10. Venue for this action is proper in the County of Queens pursuant to N.Y. C.P.L.R. §503(a), based on the residence of Plaintiff.

11. This is an action for declaratory and injunctive relief brought pursuant to the NYSHRL, Exec. Law § 290 *et seq.*, and the NYCHRL, N.Y.C. Admin. Code § 8-101 *et seq.* This Court has power to issue such relief pursuant to N.Y. C.P.L.R. § 6301. In addition, exclusive jurisdiction over a federal cause of action only exists where Congress, in an exercise of its powers under the Supremacy Clause, affirmatively divested state courts of their concurrent jurisdiction (*see, e.g., Tafflin v. Levitt*, 493 U.S. 455, 107 L. Ed. 2d 887, 110 S. Ct. 792 [1990])); because Congress has not affirmatively divested state courts of their concurrent jurisdiction over claims arising under the ADA, this Court has concurrent jurisdiction over the ADA claims asserted herein.

## PARTIES

**Plaintiff**

12. Plaintiff is a resident of Queens, New York. Plaintiff is a blind, visually impaired, handicapped person as defined under the NYSHRL and NYCHRL. Plaintiff has experienced and continues to experience discrimination as a result of the website not being accessible.

**Defendant**

13. Defendant is a company formed under New York law and transacts business in New York City through its Website. Defendant owns and/or operates the Website, which is a place of public

accommodation as defined under the ADA, the NYSHRL, New York Civil Rights Laws, and NYCHRL.

## FACTUAL ALLEGATIONS

**Access to the internet is integral to participate in modern society.**

14. In recent decades, the internet has quickly become an integral part of modern society. Per a study conducted by the MIT Technology Review published in 2018, the average American spends 23.6 hours of every week online. According to studies cited by CNBC, as of 2018, Americans spent 234 million hours shopping online during the average workday. Harvard Business Review studied the shopping behaviors of over 46,000 customers between 2015 and 2016 and found that 73% of them shopped both online and in-store. In 2018, NPR and the Marist Poll partnered up and surveyed 1,057 adults in the U.S.; of those that shopped online, 88% of them liked shopping online because the convenience of being able to shop any time of the day and find products easily.

15. The growing reliance of shopping online has been accelerated by the pandemic. According to Forbes, between 2019 and 2021, e-commerce sales grew 50.5%, while retail sales only grew 21.9% during that same period.

**Blind and/or visually impaired individuals can access the internet, like sighted individuals, through screen-reading software**

16. A 2021 study from the PEW Research Center found that 75% of all Americans with a disability report using the internet every day. People who are legally blind and/or visually impaired, like Plaintiff, made up a sizable portion of this population. Studies show that between

12 and 14 million Americans are legally blind and/or visually impaired. According to the American Foundation for the Blind, the 2019 Census identified an estimated 388,524 New Yorkers with serious sight impairment that cannot be remedied with corrective lenses.

17. While internet shopping is a convenience enjoyed by many, it can be particularly necessary for the visually impaired. Without the convenience of shopping online, a blind person would be forced to travel to a store, where usually once there, would require assistance. For instance, when visiting a retail store to buy a product, a visually impaired person will need to ask someone to direct them to the proper aisle, describe the items available that may be of interest to the individual, explain the different size options of the products that are available, read out the product's prices, direct the individual to the checkout area, *etc*.

18. In contrast, a visually impaired person can navigate an accessible website without assistance. They do so through screen reading software. This software reads the text displayed on the computer screen by reading it aloud or converting the text to braille on a tactile refreshable braille display. By repeating the visual information that appears on a computer screen (whether by voice narration or converting it into braille) in a way that it can be understood by the visually impaired individual, the screen reading software can "read" whatever is on a screen. Visually impaired users can then navigate the information on their computer screen by using their keyboards or by other methods.[1]

19. There are numerous screen readers available. Screen readers are built to work with certain computer applications. Examples of applications that screen readers can work with include, but

[1] Each screen reader has a set of commands that users can enter via the user's keyboard to navigate a computer screen's contents.

are not limited to, web browsers (*i.e.*, Google Chrome, Firefox, and others), Microsoft Word, email applications, and music players. Currently, one of the most popular screen readers available for PC is Narrator. It is free to download and is compatible with all popular web browsers.

20. In order for a screen reader to function properly when reading a website, the website itself must be properly coded to be compatible with the screen reader. If a website is not properly coded, the screen-reader will not be able to relay information on the website (that a sighted person can see) to a blind and/or visually impaired consumer. For instance, an improperly coded website will not allow the screen reader to "read" the names of the products offered for sale on the website, the descriptions of those products, customer comments and ratings of those products, the sizes in which the products are offered, the prices of the products, promotional deals and online coupons, and many other product attributes and product information.

21. Additionally, an improperly coded website may not notify a visually impaired shopper when a product has been added to their "cart," the number of items in their cart, or other information, and may not contain information directing the visually impaired individual as to where to input their shipping and payment information. Such deficiencies deprive visually impaired people of the ability to obtain important product information, make informed choices, and complete a purchase via the internet.

**To be accessible, websites should be coded per the WCAG 2.1**

22. The international website standards organization, the World Wide Web Consortium, known universally as W3C, has published an updated version (version 2.1) of the Web Content Accessibility Guidelines ("WCAG"). WCAG 2.1 is a set of well-established guidelines and criteria promulgated to ensure that websites are accessible to blind and visually impaired people. Internationally, WCAG 2.1 is widely considered to set the standard for website accessibility.

23. WCAG 2.1 contains accessibility guidelines that fall into three separate levels of accessibility—Level A, AA, and AAA—with Level A being the lowest and Level AAA being the highest. Conformance at the higher levels subsumes conformance at lower levels (*i.e.*, a website that conforms to Level AAA will also conform to Level AA and Level A criteria). To be accessible, a website should conform to at least Level AA.[2] When a website merely complies with Level A, the website will be very difficult, if not impossible, for many visually impaired users to access. Of course, a website that does not even meet Level A compliance will be even less accessible to visually impaired individuals.

24. Defendant's website fails to even meet Level A compliance.

**Defendant sells goods that are available for purchase and delivery to New York through its Website**

25. Defendant is an online retail company that sells rings, necklaces, bracelets, earrings, brooches, watches, and pendants through its website. Defendant owns and/or operates the Website.

26. Defendant is a fine jewelry retailer.

27. Defendant delivers its products to New York and across the country.

28. Defendant offers its website so that, *inter alia*, the general public can transact business on it.

[2] For instance, the EU Web Accessibility Directive states that public sector bodies must make their websites abide by the WCAG 2.1 AA standard.

29. Upon information and belief, if Defendant's Website were equally accessible to all, blind and/or visually impaired individuals would be able to independently navigate the website and complete a desired transaction, as a sighted individual could do.

**Defendant has the financial means to make its website accessible to people who are blind or visually impaired**

30. Upon information and belief, Defendant has invested substantial sums in developing its website and has generated significant revenue thereon. Upon information and belief, the revenue procured by Defendant far exceed the associated cost of making the website equally accessible to visually impaired consumers.

## HARM TO THE INDIVIDUAL PLAINTIFF

31. Plaintiff is legally blind and/or visually impaired.

32. On July 29, 2026, Plaintiff browsed and attempted to transact business on Defendant's Website. Plaintiff used the Narrator screen-reader when he tried to access the Website.

33. Plaintiff tried to purchase the Angel skin coral bead and gold necklace on the Website, but the Access Barriers encountered on the Website would not allow him to complete the purchase.

34. On each visit to Defendant's Website, Plaintiff found it difficult, if not impossible, for blind and/or visually impaired individuals, such as himself, to purchase Defendant's goods, as a result of the access barriers that exist. For example, the screen reader had the below problems due to the Website's accessibility issues:

(a) Plaintiff faced an issue with the "Sign Up for Exclusive Access" promotional dialog because Defendant's coding errors caused the submit button to lack a meaningful accessible name. As a result, Plaintiff, when using a screen reader, could not clearly determine the purpose of the button or understand that it was the control needed to submit the form.

(b) Plaintiff faced an issue with the Cookie Banner because Defendant's coding errors caused the close button to lack a meaningful accessible name. When Plaintiff used a screen reader, the control was announced only as an unclear or unlabeled symbol, making it difficult for Plaintiff to understand how to dismiss the Cookie Banner.

(c) Plaintiff faced an issue because Defendant's coding errors caused the Website to lack a "Skip to Main Content" link. As a result, Plaintiff, when navigating with a keyboard and screen reader, was required to move through the entire header and navigation before reaching the Website's primary content, creating unnecessary and burdensome navigation.

(d) Plaintiff faced an issue with the mobile logo because Defendant's coding errors caused the logo image to lack meaningful alternative text. As a result, Plaintiff's screen reader announced incorrect or incomplete information instead of properly identifying the Website or brand represented by the logo.

(e) Plaintiff faced an issue with the homepage logo because Defendant's coding errors caused its alternative text to expose the image file path rather than describe the logo. Consequently, Plaintiff's screen reader announced the file path instead of identifying the Website or company, causing confusion regarding the purpose of the image.

(f) Plaintiff faced an issue with the Search control because Defendant's coding errors caused the control to be announced only as an image without a meaningful accessible name or information indicating that it opened a search dialog. As a result, Plaintiff using a screen reader could not clearly understand the purpose or function of the Search control.

(g) Plaintiff faced an issue with the phone control because Defendant's coding errors caused the control to lack a meaningful accessible name and fail to communicate whether additional content was expanded or collapsed. As a result, Plaintiff using a screen reader was not

informed that activating the control would reveal additional options or what state the control was in.

(h) Plaintiff faced an issue with the Account and Cart controls because Defendant's coding errors caused those controls to lack meaningful accessible names and fail to communicate that they expanded additional content. As a result, Plaintiff using a screen reader could not readily determine the purpose of the controls or understand their behavior.

(i) Plaintiff faced an issue with the main navigation because Defendant's coding errors caused navigation items that expanded and collapsed submenus to be exposed to assistive technology merely as standard links. The controls did not communicate that they controlled submenus or whether those submenus were expanded or collapsed. As a result, Plaintiff using a screen reader could not determine that additional navigation options were available or understand the current state of the navigation menu.

(j) Plaintiff faced an issue with the navigation submenu because Defendant's coding errors prevented the submenu from being fully operated using only a keyboard. Plaintiff could not reliably access all submenu items, and pressing the Escape key did not close the submenu and return focus to the parent control, making it difficult for Plaintiff using keyboard and screen-reader navigation to operate the Website's navigation properly.

(k) Plaintiff faced an issue with the Wish List controls displayed on product cards because Defendant's coding errors caused those controls to be announced only as generic links without meaningful accessible names. As a result, Plaintiff using a screen reader could not determine the purpose of the control or identify which product the Wish List control related to.

(l) Plaintiff faced an issue with several social media and external links in the footer because Defendant's coding errors caused those links to lack meaningful accessible names and

failed to inform Plaintiff that they would open in a new browser tab. As a result, Plaintiff using a screen reader was not adequately informed about the destination or the change in browsing context caused by activating those links.

(m) Plaintiff faced an issue with the "Filter + Sort" control on the Collection Page because Defendant's coding errors caused a control that functioned as a button to be exposed to assistive technology as a standard link. The control did not communicate that it opened a filter dialog, and keyboard focus did not move into the dialog when it appeared. As a result, Plaintiff using a screen reader and keyboard could not reliably understand or interact with the filter functionality.

(n) Plaintiff faced an issue with the product prices on the Collection Page because Defendant's coding errors caused the prices to be presented without information identifying whether each amount represented a regular price, sale price, or another type of pricing. As a result, Plaintiff using a screen reader could not clearly distinguish between different prices displayed for the same product or fully understand the Website's pricing information.

(o) Plaintiff faced an issue with the product media gallery because Defendant's coding errors caused the gallery to be improperly exposed to screen-reader technology. Instead of recognizing the product images as parts of one media gallery or carousel, Plaintiff's screen reader announced each thumbnail as a separate carousel, resulting in repetitive and confusing announcements and making it difficult for Plaintiff to understand the relationship between the product images and the gallery controls.

(p) Plaintiff faced an issue with the Share control because Defendant's coding errors caused the control to lack a meaningful accessible name and caused its dropdown menu to open

only when the control was hovered over with a mouse. As a result, Plaintiff using a keyboard or screen reader could not reliably discover, access, or operate the Share functionality.

35. As a result of the existence of these access barriers, Plaintiff was repeatedly denied full and equal access to Defendant's Website. These access barriers impede Plaintiff's ability to navigate the Website and complete a purchase. As a result of the access barriers, Plaintiff was repeatedly denied, on each of his visits, the opportunity to purchase and to obtain the full enjoyment of the jewelry.

36. Plaintiff has actual knowledge of the access barriers that make Defendant's Website inaccessible and independently unusable by blind and visually impaired people. Given his experience on several occasions, Plaintiff knows that access barriers, such as those described above, exist on Defendant's website as of the date of the filing of this complaint.

37. Plaintiff has been unable to—and remains unable to—access the Website and complete his desired purchase. As a result, Plaintiff is deterred from returning to the Website to purchase the Angel skin coral bead and gold necklace for sale there.

38. Plaintiff still wants to purchase the Angel Skin Coral Bead and Gold Necklace offered through Defendant's Website. Plaintiff is specifically interested in the necklace's combination of angel skin coral beads and gold, including its distinctive color, natural coral appearance, and fine-jewelry character, and desires to evaluate and purchase the necklace through the Website. Plaintiff remains interested in reviewing the product's available details, including its design, bead characteristics, gold components, sizing and other available purchasing options, as well as any related variations or comparable jewelry offered through the Website. Plaintiff intends to purchase the Angel Skin Coral Bead and Gold Necklace once the access barriers are removed because he has a present and continuing desire to obtain the necklace and use Defendant's Website to evaluate

the product, review its available options and purchasing information, and complete the transaction. Plaintiff will definitely return to Defendant's Website after the accessibility barriers are remedied because he remains actively interested in purchasing this necklace and intends to use the Website to review the product, confirm its availability and details, and purchase it; Plaintiff's planned return is therefore concrete, definite, and based upon his continuing interest in the product and Defendant's online jewelry offerings.

39. Plaintiff remains expectant that the access barriers will be cured expeditiously. Once the barriers are cured, Plaintiff intends to return to the Website and purchase the Angel skin coral bead and gold necklace and sought to obtain information regarding Defendant's various offerings, in addition to potentially purchasing any other products that he was unable to learn about due to the access barriers. As Defendant's Website is available through the internet, and thus available around the clock from any internet connected device, Plaintiff will easily return to the website and purchase the Angel skin coral bead and gold necklace and obtain the information for the various products once the barriers to accessibility are removed.

**CAUSES OF ACTION COUNT I**

Violations of the New York State Human Rights Law
(N.Y. Exec. Law § 290 *et seq.*)

40. Plaintiff re-alleges and incorporates herein all previously alleged paragraphs in this Complaint.

41. The NYSHRL provides that:

> [i]t shall be unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation . . . because of the . . . disability . . . of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges.

N.Y. Exec. Law § 296(2)(a).

42. A person "includes one or more individuals, partnerships, associations, corporations, legal representatives, trustees, trustees in bankruptcy, or receivers." N.Y. Exec. Law § 292(1).

43. Pursuant to the NYSHRL, "disability" means "a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques." N.Y. Exec. Law § 292(21)(a).

44. Plaintiff is a person with a disability within the meaning of the NYSHRL. *See* N.Y. Exec. Law § 292(1), (21)(a).

45. The term "'place of public accommodation" encompasses "all places included in the meaning of such terms as . . . wholesale and retail stores and establishments dealing with goods or services of any kind." N.Y. Exec. Law § 292(9). The owner or operator of a place of public accommodation may be a "private individual and entity." *Id.* This definition equally applies both to physical structures or establishments, in addition to intangible places like a website. *See Sullivan v. Bdg Media*, 71 Misc. 3d 863, 870 (Sup. Ct. NY County 2021) (citing *Cahill v. Rosa*, 89 N.Y.2d 14, 21 (1996)).

46. The Website is a place of public accommodation within the meaning of the NYSHRL because it is a store or establishment that offers goods. N.Y. Exec. Law § 292(9). Defendant owns and/or operates the Website and is a person within the meaning of the NYSHRL. *See* N.Y. Exec. Law § 292(1), (9).

47. Under N.Y. Exec. Law § 296(2)(c)(i), the term "discriminatory practice" includes:

> a refusal to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford facilities, privileges, advantages or accommodations to individuals with disabilities, unless such person can

> demonstrate that such modifications would fundamentally alter the nature of such facilities, privileges, advantages or accommodations.

48. As the Website is currently coded, it is difficult, if not impossible, for blind and/or visually impaired individuals to navigate the Website or purchase Defendant's goods thereon, which are available to sighted individuals.

49. By failing to operate a website that is readily accessible and usable to individuals because of their disability, when viewed in its entirety, Defendant has demonstrated a policy, practice, or procedure that has refused, withheld from, or denied Plaintiff, who qualifies as a member of a protected group under the provisions of the NYSHRL, any of the accommodations, advantages, facilities, or privileges of the Website.

50. Plaintiff reasonably believes that a request to make a reasonable modification would be futile.

51. Under N.Y. Exec. Law § 296(2)(c)(ii), the term "discriminatory practice" includes:

> a refusal to take such steps as may be necessary to ensure that no individual with a disability is excluded or denied services because of the absence of auxiliary aids and services, unless such person can demonstrate that taking such steps would fundamentally alter the nature of the facility, privilege, advantage or accommodation being offered or would result in an undue burden.

52. Pursuant to the NYSHRL, "auxiliary aids and services" includes "qualified readers, taped texts or other effective methods of making visually delivered materials available to individuals with visual impairments; acquisition or modification of equipment or devices; and other similar services and actions." N.Y. Exec. Law § 296(2)(d)(iii)(B)-(D).

53. Defendant's actions constitute discrimination against Plaintiff, on the basis of disability, in violation of the NYSHRL, given that Defendant:

a. owned and operated a website that is inaccessible to blind and/or visually impaired individuals with knowledge of that discrimination; and/or

b. owned and operated a website that is inaccessible to blind and/or visually impaired individuals and should have reasonably known of that discrimination; and/or

c. failed to take steps that are necessary to ensure that no blind and/or visually impaired individuals were excluded or denied services of a website that was owned and operated by Defendant.

54. Plaintiff had actual notice that Defendant did not intend to comply with the NYSHRL, given that he found the Website to be inaccessible on each of his multiple visits to the Website. As a result, Plaintiff believed any request to make a reasonable modification or take steps necessary for him to enjoy the Website without auxiliary aids.

55. Through the conduct described above, Defendant, in its role as the owner and/or operator of the Website, has committed unlawful discriminatory practices against Plaintiff and has violated Section 296 of the NYSHRL.

56. Defendant has failed to take any prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

57. As a direct and proximate result of Defendant's aforementioned conduct, Plaintiff has been injured, and continues to be injured.

58. Defendant's conduct constitutes an ongoing and continuous violation of the NYSHRL. Unless Defendant is enjoined from further violations, Plaintiff will continue to suffer injuries for which there is no adequate remedy at law. In particular, Plaintiff will suffer irreparable harm in that Plaintiff will continue to be discriminated against and denied the accommodations,

advantages, facilities, or privileges of the website, as well as accommodations that would provide them the opportunity to benefit from it.

59. Thus, Plaintiff is entitled to injunctive relief, damages, and reasonable attorneys' fees and costs.

60. Plaintiff sustained damages in an amount to be determined at trial. In no event will the individual costs of damages and all other relief awarded to Plaintiff be more than $74,999.00 when calculated with the total costs of damages and all other relief awarded for this suit.

**COUNT II**

Violations of the New York State Civil Rights Law
(Civil Rights Law § 40 *et seq.*)

61. Plaintiff re-alleges and incorporates herein all previously alleged paragraphs in this Complaint.

62. The New York State Civil Rights Law mandates that "all persons within the jurisdiction of [New York] shall be entitled to the full and equal accommodations, advantages, facilities, and privileges of any places of public accommodations." N.Y. Civ. Rights Law § 40.

63. The Civil Rights Law provides that:

> [n]o person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any [place or provider of public accommodation] shall directly or indirectly refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof . . . .

**Civil Rights Law § 40.**

64. The Website is a place of public accommodation under Civil Rights Law § 40.

65. Defendant is subject to the Civil Rights Law § 40 given that it owns and/or operates the Website. Defendant is within the meaning of "the owner, lessee, proprietor, manager, superintendent, agent or employee of" a place of public accommodation. Civil Rights Law § 40.

66. Defendant violated the Section 40 of the Civil Rights Law by failing to remove access barriers from the Website, which make it difficult, if not impossible, for blind and/or visually impaired individuals to navigate the Website or purchase Defendant's goods thereon, which are available to sighted individuals.

67. Civil Rights Law § 41 states that "any corporation which shall violate any of the provisions of sections forty . . . shall for each and every violation thereof be liable to a penalty of not less than one hundred dollars nor more than five hundred dollars, to be recovered by the person aggrieved thereby . . . ."

68. Defendant has failed to take any prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

69. As a direct and proximate result of Defendant's conduct, Plaintiff has been injured, and continues to be injured.

70. Defendant discriminates and will continue in the future to discriminate against Plaintiff on the basis of disability are being directly and indirectly refused, withheld from, or denied the accommodations, advantages, and privileges thereof in § 40 *et seq.* and/or its implementing regulations.

71. Defendant's conduct constitutes an ongoing and continuous violation of the Civil Rights Law. Unless Defendant is enjoined from further violations, Plaintiff will continue to suffer injuries for which there is no adequate remedy at law. In particular, Plaintiff will suffer irreparable harm in that Plaintiff will continue to be discriminated against and denied the accommodations, advantages, facilities, or privileges of the website, as well as accommodations that would provide them the opportunity to benefit from it.

72. Plaintiff sustained damages in an amount to be determined at trial. In no event will the individual costs of damages and all other relief awarded to Plaintiff be more than $74,999.00 when calculated with the total costs of damages and all other relief awarded for this suit.

**COUNT III**

Violations of the New York State Civil Rights Law
(Civil Rights Law § 40-c *et seq.*)

73. Plaintiff re-alleges and incorporates herein all previously alleged paragraphs in this Complaint.

74. The New York State Civil Rights Law mandates that "all persons within the jurisdiction of [New York] shall be entitled to the equal protection of the laws of [New York] or any subdivision thereof." N.Y. Civ. Rights Law § 40.

75. Under Civil Rights Law § 40-c(2), "[n]o person shall, because of . . . disability, as such a term is defined in section [292] of the executive law, be subject to any discrimination in his or her civil rights . . . in the exercise thereof, by any other person, or by any firm, corporation or institution . . . ."

76. Plaintiff is a person with a disability within the meaning of the N.Y. Exec. Law § 292(21)(a).

77. Defendant is within the meaning of "any other person, or . . . any firm, corporation or institution." Civil Rights Law § 40-c(2).

78. Defendant has violated the section 40-c(2) of the Civil Rights Law by failing to remove access barriers from the Website, which make it difficult, if not impossible, for blind and/or visually impaired individuals to navigate the Website or purchase Defendant's goods thereon,

which are available to sighted individuals. As such, Defendant has subjected Plaintiff to discrimination under Civil Rights Law § 40-c(2).

79. Defendant has failed to take any prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

80. As a direct and proximate result of Defendant's aforementioned conduct, Plaintiff has been injured, and continues to be injured.

81. Defendant discriminates and will continue in the future to discriminate against Plaintiff on the basis of disability are being directly and indirectly refused, withheld from, or denied the accommodations, advantages, and privileges thereof in § 40 *et seq.* and/or its implementing regulations.

82. Defendant's conduct constitutes an ongoing and continuous violation of the Civil Rights Law. Unless Defendant is enjoined from further violations, Plaintiff will continue to suffer injuries for which there is no adequate remedy at law. In particular, Plaintiff will suffer irreparable harm in that Plaintiff will continue to be discriminated against and denied the accommodations, advantages, facilities, or privileges of the website, as well as accommodations that would provide them the opportunity to benefit from it.

**COUNT IV**

Violations of the New York City Human Rights Law
(N.Y.C. Admin. Code § 8-101 *et seq.*)

83. Plaintiff re-alleges and incorporates herein all previously alleged paragraphs in this Complaint.

84. N.Y.C. Admin. Code § 8-107(4)(a), provides that "[i]t shall be unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or

employee of any place or provider of public accommodation because of the actual or perceived . . . disability . . . status of any person directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . . ." Persons include all "natural persons, proprietorship partnerships, associations, group associations, organizations, governmental bodies or agencies, corporations [and] legal representatives . . . ." N.Y.C. Admin. Code § 8-102.

85. Pursuant to the NYCHRL, "disability" encompasses any impairment, regardless of whether the impairment substantially limits a person's ability to engage in major life activities. *See id.* § 8-102 (defining disability as "any physical, medical, mental or psychological impairment, or a history or record of such impairment").

86. The term "place or provider of public accommodation" encompasses "providers, whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages or privileges of any kind, and places whether licensed or unlicensed, where goods, services, facilities, accommodations, advantages or privileges of any kind are extended, offered, sold or otherwise made available." N.Y.C. Admin. Code § 8-102.

87. A website constitutes a place of public accommodation that is offered to the general public within the meaning of N.Y.C. Admin. Code § 8-102. Defendant owns and/or operates the website. Accordingly, Defendant is a "person[]" within N.Y.C. Admin. Code § 8-102.

88. Because the inaccessibility of the website discriminates against people who are blind and/or visually impaired by denying them access to the website, by making it difficult, if not impossible for them to navigate or purchase Defendant's products on, Defendant, in its role as the owner and/or operator of the website, violated N.Y.C. Admin. Code § 8-107(4)(a).

89. Defendant's conduct also violates N.Y.C. Admin. Code § 8-107(17), which states that "unlawful discriminatory practice . . . is established . . . [when plaintiff] demonstrates that a policy or practice of a covered entity or a group of policies or practices of a covered entity results in a disparate impact to the detriment of any group protected by the provisions of this chapter."

90. By failing to operate a website that is readily accessible and usable to individuals because of their disability, when viewed in its entirety, Defendant has demonstrated a policy, practice, or procedure that has refused, withheld from, or denied Plaintiff, who qualifies as a member of a protected group under the provisions of the NYCHRL, any of the accommodations, advantages, facilities, or privileges of the Website.

91. The violations are particularly serious given the NYCHRL's "uniquely remedial" purpose, which provides that each section must be "construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights law, including those laws with provisions comparably-worded to provisions of this title, have been so construed." N.Y.C. Admin. Code § 8-130.

92. Accordingly, Defendant's conduct is subject to a much stricter standard than under state or federal law, and its liability under these provisions must be determined separately and independently from its liability under the disability provisions of either state or federal law.

93. As a direct and proximate result of Defendant's violations of the NYCHRL, Plaintiff has been injured as set forth herein.

94. Defendant's conduct constitutes an ongoing and continuous violation of the NYCHRL. Unless Defendant is enjoined from further violations, Plaintiff will continue to suffer injuries for which there is no adequate remedy at law. In particular, Plaintiff will suffer irreparable harm in that Plaintiff will continue to be discriminated against and denied the accommodations,

advantages, facilities, or privileges of the website, as well as accommodations that would provide them the opportunity to benefit from it.

95. Thus, Plaintiff is entitled to injunctive relief, damages, and reasonable attorneys' fees and costs pursuant to N.Y.C. Admin. Code §§ 8-120(a)(8), 8-126(a), 8-502.

96. Plaintiff sustained damages in an amount to be determined at trial. In no event will the individual costs of damages and all other relief awarded to Plaintiff be more than $74,999.00 when calculated with the total costs of damages and all other relief awarded for this suit.

**COUNT V**

Violation of 42 U.S.C. §§ 12181 *et seq*. – Title III of the ADA

97. Plaintiff re-alleges and incorporates herein all previously alleged paragraphs in this Complaint.

98. Title III of the American with Disabilities Act of 1990, 42 U.S.C. § 12182(a) provides that "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." Title III also prohibits an entity from "[u]tilizing standards or criteria or methods of administration that have the effect of discriminating on the basis of disability." 42 U.S.C. § 12181(b)(2)(D)(I).

99. Defendant's Website is a sales establishment and public accommodation within the definition of 42 U.S.C. § 12181(7).

100. Defendant is subject to Title III of the ADA because it owns and operates the Website.

101. Under Title III of the ADA, 42 U.S.C. § 12182(b)(1)(A)(I), it is unlawful discrimination to deny individuals with disabilities or a class of individuals with disabilities the opportunity to

participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity.

102. Under Title III of the ADA, 42 U.S.C. § 12182(b)(1)(A)(II), it is unlawful discrimination to deny individuals with disabilities or a class of individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodation, which is equal to the opportunities afforded to other individuals.

103. Specifically, under Title III of the ADA, 42 U.S.C. § 12182(b)(2)(A)(II), unlawful discrimination includes, among other things, "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations."

104. In addition, under Title III of the ADA, 42 U.S.C. § 12182(b)(2)(A)(III), unlawful discrimination also includes, among other things, "a failure to take such steps as may be necessary to ensure that no individual with disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden."

105. There are readily available, well-established guidelines on the Internet for making websites accessible to the blind and visually-impaired. These guidelines have been followed by other business entities in making their websites accessible, including but not limited to ensuring adequate prompting and accessible alt-text. Incorporating the basic components to make their

website accessible would neither fundamentally alter the nature of Defendant's business nor result in an undue burden to Defendant.

106. The acts alleged herein constitute violations of Title III of the ADA, 42 U.S.C. § 12101 et seq., and the regulations promulgated thereunder. Patrons who are blind, including Plaintiff, have been denied full and equal access to Defendant's Website, have not been provided services that are provided to other patrons who are not disabled, and/or have been provided services that are inferior to the services provided to non-disabled patrons.

107. As demonstrated by Plaintiff's experience with the Website, Defendant has failed to take any prompt and equitable steps to remedy its discriminatory conduct, and these violations are ongoing.

108. As such, Defendant discriminates, and will continue in the future to discriminate against Plaintiff on the basis of disability by denying Plaintiff the full and equal enjoyment of the goods, services, facilities, privileges, advantages, accommodations and/or opportunities it offers in conjunction with its Website in violation of Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181 et seq. and/or its implementing regulations.

109. The actions of Defendant were and are in violation of the ADA, and therefore Plaintiff invokes his statutory right to injunctive relief to remedy the discrimination.

110. Unless the Court enjoins Defendant from continuing to engage in these unlawful practices, Plaintiff will continue to suffer irreparable harm.

111. Plaintiff is also entitled to reasonable attorneys' fees and costs.

**COUNT VI**

Declaratory Relief

112. Plaintiff re-alleges and incorporates herein all previously alleged paragraphs in this Complaint.

113. Plaintiff contends that Defendant has failed/is failing to comply with applicable laws prohibiting discrimination against people who are blind and/or visually impaired affecting their capacity to use the Website in violation of the ADA, N.Y. Exec. Law § 290 *et seq.*, Civil Rights Law § 40 *et seq.*, Civil Rights Law § 40-c *et seq.*, and N.Y.C. Admin. Code § 8-101 *et seq*.

114. An actual controversy has arisen and now exists between the parties in that Plaintiff contends, and is informed and believes that Defendant denies Plaintiff's contentions.

115. A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands a judgment as follows:

a. awarding statutory money damages (including, but not limited to, $500 for each violation pursuant to NYSCRL § 41), actual damages and punitive damages, including prejudgment and post-judgment interest;

b. providing a declaration that Defendant owns, maintains and/or operates its website in a manner that discriminates against the blind and visually impaired;

c. granting a preliminary and permanent injunction requiring Defendant to take all the steps necessary to make its website fully comply with the requirements set forth in the NYSHRL, NYSCRL, and NYCHRL;

d. granting a preliminary and permanent injunction requiring Defendant to take all the steps necessary to make its website fully comply with the requirements set forth in the ADA

e. awarding attorneys' fees and costs, and other relief;

f. awarding such other relief as this Court deems just and proper; and

g. Plaintiff expressly limits the total amount of the individual recovery-including without limitation general and consequential damages, attorneys' fees, litigation expenses, costs, pre- and post-judgment interest, and cost of the non-monetary obligations that Plaintiff seeks specific performance of an amount not to exceed $74,999.00.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: White Plains, New York
August 20, 2026

KRAVETS & ASSOCIATES, P.C.
*Attorneys for Plaintiff*

**/s/ Aleksandra Kravets**

**By:** Aleksandra Kravets, Esq.
75 South Broadway, Suite 4505
White Plains, New York 10601
Tel 347-268-9533
Email : ak@akesqpa.com